IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| TIMOTHY JAMES | § | |
| | § | CIVIL ACTION NO. 6:06cv120 |
| V. CARLSON, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL AND TRANSFER

The Plaintiff Timothy James, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights.   The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. 636(c).   James' complaint incorporates claims arising at the Beto Unit of TDCJ, located in the Eastern District of Texas, and the Hamilton Unit of TDCJ, which is located in Brazos County, in the Southern District of Texas.   This opinion covers only those claims and defendants located in the Eastern District of Texas.   As Defendants, James named V. Carlson and E. Cairns from the Beto Unit; Stacie Martin, Rick Adair, Sgt. Hosea, Captain Muniz, Captain Jones, and Warden Roberson from the Hamilton Unit; Madeline Ortiz, the Director of the TDCJ-CID Rehabilitation and Re-Entry Division; and Douglas Dretke, the Executive Director of TDCJ-CID.

An evidentiary hearing was conducted on January 30, 2007, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985).   At this hearing and in his complaint, James testified that on October 6, 2003, he was granted parole in October of 2004, contingent upon his completion of a rehabilitation program.   This program was known as a PRTC, or pre-release therapeutic community.

James stated that prior to entering the program, he had been diagnosed as suffering from hyperthyroidism, and had certain work restrictions and limitations.   He says that Stacie Martin

1

was assigned as his primary counsel in the program, and he told her about his restrictions and limitations.

On May 10, 2004, James says, he and other program participants were called out of their cells for lunch, and made to stand for an hour before going into the dining hall.  This caused him to suffer "excruciating pain" in his knees and other joints.  After lunch, he returned to his cell, but was called out again and made to stand again, for 45 minutes.  James says that the pain grew so intense that he had to sit down on the stairs.  Carlson came over to him and ordered him to stand up. He told Carlson that he was medically restricted from standing for long periods of time, and she said that his restrictions were of no concern to her and that if his condition would not let him stand for long periods of time, he should get out of the program.

On June 6, 2004, James says that he was experiencing palpitations, so he went to the infirmary.  There, he was told to lie down so that the anxiety and stress would dissipate.  At the hearing, James explained that he had been sent to his cell to lie down there.  Officer Cairns came to his cell and he told her about the problems he was having, and she told him to go to his group meeting or she would write him a case.

James says that as part of the PRTC program, inmates are required to sit in a position called "props."  He states that this consists of sitting with hands on knees, elbows and back locked, and head straight in an upright position, sometimes for hours at a time.

On June 16, 2004, James says, he was made to sit in "props," and after sitting that way for an hour, he told Carlson that he could no longer sit in that position because of the pain in his knees, elbows, lower back, and neck.  Carlson thereupon subjected him to disciplinary action.[1] Similar circumstances occurred on June 22, when Carlson again subjected him to disciplinary action. The remainder of Carlson's complaint consists of incidents at the Hamilton Unit in Bryan, Texas,

---

[1]According to James' prison records, he did not receive a case from Carlson on this date, although he did receive one from Officer Cairns on June 16 for refusing to stand for a required program.

2

which is outside of the Eastern District of Texas; he was transferred off of the Beto Unit on July 23, 2004.

James stated that he was suing Madeline Ortiz because she was executive director of the rehabilitation program and failed to properly manage her subordinates.  James stated that in the PRTC program, some inmates were allowed to manage others, which he says was declared unconstitutional by the Ruiz litigation.  He added that he was suing Douglas Dretke, then Executive Director of TDCJ-CID, because he had written Dretke a letter but received no response.  James noted that to get out of the program, as Carlson had suggested, he would have to give up his parole.

The Court has reviewed copies of James' prison records.  These records show that on May 10, 2004, James received a disciplinary case saying that Carlson had ordered him to stand up from sitting on the stairs and he refused to do so.  Additional information from Carlson in the hearing paperwork says that she ordered him three times before he complied; James' statement was that he was feeling bad because of his medical condition.  The case was graded as minor and as punishment, James received 15 days of cell restriction and 15 days of commissary restriction.

On June 16, 2004, James received a disciplinary case from Office Cairns for refusing to stand for what was described as a "family TPR," apparently some type of treatment program.  He made a statement to the effect that the counselor would not tell him why she wanted him to stand, and that the counselor "appears to have some kind of vendetta against me."  The case was graded as minor and James received 30 days of cell and commissary restrictions.

On June 22, 2004, James received a disciplinary case from Carlson for failing to attend a required treatment program in that he refused to sit at "props" in the dayroom for a confrontation group meeting.  The disciplinary hearing records contain a statement from nurse manager J. Fields to the effect that James can sit at "props" as long as he is allowed to stand up every 45 minutes or so; Fields noted that James' restrictions are limited sitting and limited standing.  This disciplinary case was graded as major and James received 45 days of cell and commissary restrictions, a reduction in classification status, and the loss of 30 days of good time.

James' medical records show that on April 14, 2004, he saw Dr. Clayton, who noted that he had been diagnosed with Graves' disease (i.e. hyperthyroidism) in 2003, and that he had been last seen in Galveston in March of 2004, but that James was not on medication at that time.  On May 1, 2004, he saw the nurse complaining of thyroid problems.  The entry in the medical record notes that he had seen the doctor on April 14 and that he had an appointment in Galveston in a few months.  On May 12, 2004, he saw a physician's assistant named Buchanan with a complaint of facial pseudofolliculitis, for which he received a clipper shave pass and medication for his skin.  On May 19, he saw Dr. Clayton with a complaint of thyroid problems, and the doctor noted that James would be seen in Galveston, that Dr. Clayton would re-check the labs, James would have a cell pass for five days and a hypercaloric diet for three months, and work restrictions would be added.  He also ordered that James have a follow-up appointment in 60 days. Some medications were discontinued and James was given thyroid stimulating hormone

On April 10, 2004, James filed a sick call request saying that his thyroid gland was "swollen and sore," as well as a separate request saying that he needed his clipper shave pass renewed.  On April 30, 2004, he filed a sick call request saying that his thyroid gland was hurting, and he was scheduled for sick call.  On May 9, 2004, he filed a sick call request asking for a clipper shave pass, and the response was that he was scheduled for sick call.  On July 15, 2004, James filed a sick call request saying that his thyroid symptoms have increased, and the response again was that he had been scheduled for sick call.  None of his sick call requests make any specific mention of problems arising from being forced to sit in "props" or of any other aspect of the PRTC program affecting his health or well-being.

On November 20, 2003, James had a health summary for classification form[2] which imposed a four-hour work restriction, as well as no work in direct sunlight and no temperature extremes.  On April 21, 2004, James received a new classification form which included no work

---

[2]This form, known as an HS-18, is the document which records inmates' classification, housing, and work restrictions.

restrictions at all.  This lasted for about a month, and then on May 19, 2004, he saw Dr. Clayton, who imposed a four-hour work restriction, limited standing, limited sitting, and no temperature extremes. This classification remained in effect until October of 2004, when the restrictions on limited standing and limited sitting were removed.

James says that the Defendants were deliberately indifferent to his medical condition, that they inflicted cruel and unusual punishment by making him sit in "props" and giving him disciplinary cases when he could not do so, and thereby causing his release on parole to be delayed. He also says that the Defendants conspired against him and that he was unconstitutionally subjected to the whims of other prisoners.

## Legal Standards and Analysis

James' first complaint is that the Defendants were deliberately indifferent to his medical condition.  However, James' medical records show that from the time he came to the PRTC program until April 21, 2004, his classification chart provided for a four-hour work restriction, no work in direct sunlight, and no work in temperature extremes.  He was not restricted to a lower bunk or to a lower row, and he had no sitting or standing restrictions.   This classification chart was signed by a medical provider, a physician's assistant named Thomas.  The TDCJ personnel were entitled to rely on the medical department's assessment of James' condition in determining what he could and could not do, and there is nothing in his classification chart which indicates that he could not sit in "props," which James described at the hearing as "sitting at attention."

On April 21, 2004, the restrictions which James had were removed, by a physician's assistant named Hardy.  With no work restrictions at all on his chart, there was plainly no basis for the PRTC staff to believe that James could not sit in "props."

On May 19, 2004, James saw Dr. Clayton, who did impose some restrictions on him. These restrictions included a four-hour work restriction, limited standing, limited sitting, and no temperature extremes.  Even with these restrictions, James has shown no reason why the staff should know that he could not sit in "props" for the time required, which James says was up to an hour.

Prison officials have a duty not to be deliberately indifferent to the safety of their inmates.  Johnston v. Lucas, 786 F.2d 1254, 1260 (5th Cir. 1986); Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986).  A showing of mere negligent indifference is not enough for a constitutional claim.  Davidson v. Cannon, 474 U.S. 344 (1986).

In Davidson, the Supreme Court faced the issue of what constitutes deliberate indifference to an inmate's safety.  There, an inmate named Davidson was threatened by another inmate, McMillian.  Davidson sent a note to the Assistant Superintendent of the prison, Cannon.  Cannon passed the note to a guard named James.  James, however, left the note on his desk and later forgot about it.  McMillian later assaulted Davidson, causing serious injuries.

The Supreme Court acknowledged that the Defendants' lack of due care resulted in serious injury, but held that the lack of due care alone did not approach the sort of abusive governmental conduct that the Due Process Clause was designed to prevent.  The Court emphasized that negligence alone was insufficient to trigger the protections of the Fourteenth Amendment.  Davidson, 474 U.S. at 347-48.

More recently, the Supreme Court has again addressed the issue of deliberate indifference to an inmate's safety in prison.  The Court explained that

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ...
>
> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994); see Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).

In this case, James has failed to show that the Defendants were deliberately indifferent to his health or medical needs.  His classification record offered no reason for the PRTC staff to believe that he could not comply with this aspect of the program, and even if the officers' requiring

6

him to sit in "props" may have been negligence, James has not shown deliberate indifference.  His claim on this point is without merit.

Similarly, the fact that the officers gave him disciplinary cases when he did not comply with program requirements is not a constitutional violation, because the medical records offered no basis upon which the Defendants could have known that James could not in fact do so. The PRTC staff had no obligation to believe James' description of his medical condition over that of the medical professionals who completed his classification chart. Even if the officers acted negligently in giving him these disciplinary cases, James has not shown deliberate indifference.

Similarly, James complains of an incident where he was sent to lie down in his cell, and Officer Cairns came over and told him to get up; when he said that he could not, she gave him a case.  The medical records do not show that James was seen in the infirmary at all that day, and so Cairns could not have known that James was in fact unable to get up when she ordered him to. Furthermore, James' records do not show that he received a disciplinary case from Officer Cairns on this date, and so he has not shown that he suffered any harm by the fact that she threatened to give him a case on this date.

To the extent that James seeks to challenge the disciplinary case in which he lost good time, he has failed to show that this case has been reversed, expunged, or otherwise set aside.  The Fifth Circuit has held that inmates cannot seek recovery of lost good time credits in a civil rights lawsuit under 42 U.S.C. §1983.  Clarke v. Stalder, 154 F.3d 186, 189 (5th Cir. 1998).  Similarly, a prisoner cannot seek the overturning of a disciplinary case in which he lost good time credits under Section 1983, nor seek damages for such a case until that case is overturned, expunged by executive order, or otherwise declared invalid in a state collateral proceeding or through a federal habeas corpus writ.  Clarke, 154 F.3d at 189, *citing* Edwards v. Balisok, 117 S.Ct. 1584, 1587-88 (1997). Instead, because good time credits implicate the length of confinement, habeas corpus is the proper means for presenting such claims to the federal courts.  Thus, James cannot challenge the validity

of the case in which he lost good time credits - the case he received from Carlson for refusing to sit at "props" - until this case has been expunged or set aside.[3]

More pertinently, James has not shown that he was denied due process in any of the three disciplinary hearings about which he complains.  As a general rule, notice of charges and an opportunity to be heard are the touchstones of due process in the context of prison disciplinary matters.  <u>Wolff v. McDonnell</u>, 418 U.S. 539, 563-66 (1974).  The Fifth Circuit has explained that the federal courts cannot retry every prison disciplinary dispute; rather, the court may act only where arbitrary or capricious action is shown.  <u>Stewart v. Thigpen</u>, 730 F.2d 1002 (5th Cir. 1984).  This means that prison disciplinary proceedings will be overturned only where there is no evidence whatsoever to support the result reached.  <u>Smith v. Rabelais</u>, 659 F.2d 539 (5th Cir. 1981); *see also* <u>Adams v. Gunnell</u>, 729 F.2d 362, 370 (5th Cir. 1983) (hearing officer's decision will be upheld when it is supported by "some facts ... any evidence at all.")  An officer's report, by itself, is sufficient to support a finding of guilt.  <u>Hudson v. Johnson</u>, 242 F.3d 534, 536-37 (5th Cir. 2001).  The district court, in reviewing this issue, need not conduct a *de novo* factual review.  <u>Smith</u>, 659 F.2d at 545.

It is important to note in this regard that in the context of prison disciplinary proceedings, the Constitution requires due process, not error-free decision-making.  <u>McCrae v. Hankins</u>, 720 F.2d 863, 868 (5th Cir. 1983).

James does not contend that he was denied notice of the charges or an opportunity to be heard in the disciplinary cases; he merely contends that the wrong result was reached.  In the one major case, for not sitting at "props," the hearing record shows that the medical department was contacted and stated that James could sit at "props" as long as he was given the opportunity to stretch every 45 minutes or so.  This Court cannot conduct a *de novo* factual review and re-try the disciplinary proceeding, believing James rather than the evidence against him.  Even if the findings of guilt in the cases were in error, James has not shown that he was denied due process.

_____

[3]This discussion assumes that James in fact has a protected liberty interest in his good time, through eligibility for release on mandatory supervision.  If he does not have such an interest, then his claims regarding the disciplinary case fail because of the absence of such an interest.

With regard to the minor cases, James has not shown that he was deprived of a constitutionally protected liberty interest.  The Fifth Circuit has held that to bring a procedural due process claim, the plaintiff must identify a protected liberty interest.  San Jacinto Savings & Loan v. Kacal, 928 F.2d 697, 700 (5th Cir. 1991); Augustine v. Doe, 740 F.2d 322, 327 (5th Cir. 1984).  This is the essence of the Supreme Court's decision in Sandin v. Conner, 115 S.Ct. 2293, 2301 (1995).[4]

In Sandin, a Hawaii prison inmate received a disciplinary case for "high misconduct" and two others for "low moderate misconduct."  He appeared before the disciplinary hearing panel, but was not permitted to call witnesses.  He was convicted of the charges and sentenced to 30 days of disciplinary segregation on the high misconduct charge and four hours of disciplinary segregation for each of the other two charges, served concurrently with the 30 days of confinement.  Conner brought suit, claiming a denial of procedural due process in connection with the disciplinary hearing.

The trial court granted summary judgment in favor of the defendants, but was reversed on appeal.  The Ninth Circuit held that Conner had a liberty interest in remaining free from disciplinary segregation and that there was a disputed question of fact with respect to whether or not Conner received all of the process due under the Supreme Court's decision in Wolff v. McDonnell, 418 U.S. 539 (1974).

In analyzing the plaintiff's claim, the Supreme Court first examined the state of the law, beginning with Wolff.  There, the issue involved good time credits which bestowed mandatory sentence reductions and a regulation which provided that these credits could be revoked only for "flagrant or serious misconduct."  Wolff, 418 U.S. at 545-46 and nn. 5 & 6.  The Court held that the statutory provisions in question created a liberty interest in a shortened sentence, which was an interest of "real substance" requiring minimum procedures necessary to reach an "accommodation

---

[4]James lost no good time in the two minor cases, and so they do not affect the fact or legality of his detention; consequently, he may challenge these cases through a Section 1983 lawsuit, and need not proceed in habeas corpus first. See Carson v. Johnson, 112 F.3d 818, 820-21 (5th Cir. 1997).

between institutional needs and objectives and the provisions of the Constitution." Wolff, 418 U.S. at 556-57.

Wolff was followed by Meachum v. Fano, 427 U.S. 215 (1976). There, Massachusetts inmates complained of transfers from a medium security facility to a maximum security prison which had substantially less favorable conditions. These transfers did not involve the loss of good time credits or any period of disciplinary confinement. Meachum, 427 U.S. at 222.

In analyzing the claim, the Court first laid down the principle that the Due Process Clause does not protect every change in the conditions of confinement which has a substantial adverse effect upon a prisoner. Meachum, 427 U.S. at 224. Further, the Court held that the Due Process Clause itself does not create a liberty interest in prisoners being free from intrastate prison transfers because transfer to a maximum security facility, even one with more burdensome conditions, is "within the normal limits or range of custody which the conviction has authorized the State to impose." Meachum, 427 U.S. at 225. The Court said that Wolff was distinguishable because the protected liberty interest in good time credit was created by state law, while in Meachum, no law stripped away the discretion of state officials to transfer inmates for any reason or none at all. Meachum, 427 U.S. at 228.

### The Mandatory or Discretionary Language Analysis

The cases after Meachum seized upon this dictum to place ever greater emphasis upon the dichotomy between mandatory and discretionary state regulations. See Sandin, 115 S.Ct. at 2298. This approach came to fruition in Hewitt v. Helms, 459 U.S. 460 (1983). In Hewitt, the Court did not look to whether the State had created an interest of "real substance," as in Wolff; instead, the Court posed the question of whether the State had gone beyond issuing mere procedural guidelines and had used language of an unmistakably mandatory character such that an incursion upon liberty would not occur absent specified substantive predicates. Sandin, 115 S.Ct. at 2298, *quoting* Hewitt, 459 U.S. at 471-72.

10

The use of this methodology meant that inmates no longer were required to show an interest of "real substance" or that they faced a "grievous loss" of liberty retained after incarceration. Sandin, 115 S.Ct. at 2298, *citing* Morrissey v. Brewer, 408 U.S. 471, 481 (1972).  Instead, the inquiry had shifted from the nature of the deprivation to the language of the regulation.  Sandin, 115 S.Ct. at 2299; *see* Olim v. Wakinekona, 461 U.S. 238 (1983) (liberty interest in interstate transfer revolved around language of regulation); Kentucky Department of Corrections v. Thompson, 490 U.S. 454 (1989) (liberty interest in visitation privileges revolved around language of regulation).

These holdings were routinely followed by the circuit courts, including the Fifth Circuit.  *See, e.g.*, Giovanni v. Lynn, 48 F.3d 908 (5th Cir. 1995) (analyzing the liberty interest presented in the context of the language of the regulations involved, citing Olim and Thompson).

### The Holding in Sandin

In Sandin, however, the Supreme Court announced that this analytical framework has "strayed from the real concerns undergirding the liberty protected by the Due Process Clause" and that "it is time to return" to the principles set out in Wolff and Meachum.  Sandin, 115 S.Ct. at 2300. Rather than examining the language of the regulations, the Court stated that the operative interest involved was the nature of the deprivation.  Hence, the Court specifically disapproved of the mandatory or discretionary language analysis set out in Hewitt and its progeny.  Sandin, 115 S.Ct. at 2300 and n.5.

Instead, the Court held that the States may, under certain circumstances, create liberty interests which are protected by the Due Process Clause, but these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.  Sandin, 115 S.Ct. at 2301.

Sandin cited Vitek v. Jones, 445 U.S. 480 (1980) (transfer to mental hospital triggers Due Process Clause) and Washington v. Harper, 494 U.S. 210, 221-222 (1990) (involuntary

administration of psychotropic drugs implicates Due Process Clause), as examples of restraints which trigger the Clause of their own force, but stated that the incarceration in disciplinary segregation present in that case did not create the type of deprivation in which the State might have created a liberty interest.  Sandin, 115 S.Ct. at 2297 n.4, 2299-300.  As a result, the Court held that neither the Hawaii prison regulation at issue nor the Due Process Clause itself afforded the inmate a protected liberty interest entitling him to the procedural protections of Wolff.  Sandin, 115 S.Ct. at 2302.  The Court concluded that the fact that Conner was not permitted to call witnesses at his disciplinary hearing was not sufficient to accord him relief because no protected liberty interest was at stake.

In the two disciplinary cases which were graded as minor (i.e. he did not lose good time), James received a total of 45 days of cell restrictions and 45 days of commissary restrictions.  These punishments do not impose an atypical and significant hardship upon him in relation to the ordinary incidents of prison life.  See Sandin, 115 S.Ct. at 2301 (30 days of disciplinary segregation held not an atypical or significant hardship); Pichardo v. Kinker, 73 F.3d 612, 613 (5th Cir. 1996); Malchi v. Thaler, 211 F.3d 953, 959 (5th Cir. 2000); and Wilson v. Budney, 976 F.2d 957, 958 (5th Cir. 1992).

Consequently, James has failed to identify a constitutionally protected liberty interest which was violated by the disciplinary cases of which he complains.  The Supreme Court made clear that the operative interest is the nature of the deprivation, and James simply has not shown that the relatively minor deprivations visited upon him as a result of this case implicate any constitutionally protected liberty interests.  Sandin, 115 S.Ct. at 2301; see also Wilkinson v. Austin, 125 S.Ct. 2384, 2394 (2005) (citing Sandin).  In the absence of the denial of any constitutionally protected liberty interest, James' claims regarding these cases must fail.

James complains that making him sit in "props" amounted to cruel and unusual punishment.  The Fifth Circuit has explained that indicia of confinement constituting cruel and unusual punishment include wanton and unnecessary infliction of pain, conditions grossly

disproportionate to the severity of the crime warranting imprisonment, and the deprivation of the minimal civilized measures of life's necessities.  Wilson v. Lynaugh, 878 F.2d 846, 848 (5th Cir.), *cert. denied* 493 U.S. 969 (1989).  The Supreme Court has held, however, that to the extent that prison conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.  Rhodes v. Chapman, 452 U.S. 337, 346-7 (1981).

The Rhodes Court held that any Eighth Amendment analysis must look to the evolving standards of decency that mark the progress of a maturing society, but cautioned that the standards are derived from objective factors.  Rhodes, 452 U.S. at 346.

In compliance with the Supreme Court's opinion, the Fifth Circuit has stated that the Eighth Amendment does not afford protection against "mere discomfort or inconvenience." Wilson, 878 F.2d at 849.

In the present case, James has not shown that a requirement of sitting at attention amounts to the unnecessary and wanton infliction of pain, was a condition grossly disproportionate to the severity of the crime, or deprived him of the minimal civilized measures of life's necessities. While this requirements may have caused him to suffer discomfort or inconvenience, this does not rise to the level of an Eighth Amendment violation.

Such a requirement may have amounted to cruel and unusual punishment if the prison officials knew that the requirement was clearly contrary to James' medical restrictions, but ordered him to do so anyway.  At the Spears hearing, Warden Pratt, a TDCJ-CID official, testified under oath that the PRTC program was considered to be the work assignment of the participants.  The Fifth Circuit has stated that requiring an inmate to work (or, by extension, to participate in a program which substitutes for work) beyond his physical capacity may raise a valid civil rights issue, but the Plaintiff must show that the work has been assigned with knowledge of the condition and that it will be worsened thereby, or continued with the same knowledge.  As a result, the Fifth Circuit said, only if the officials know that the work assigned will significantly aggravate a serious medical condition will there be an Eighth Amendment violation. Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989);

*accord*, <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 194 (5th Cir. 1993) (if prison officials assign an inmate to a work detail and they know that such an assignment could exacerbate a serious physical ailment, then such a decision could constitute deliberate indifference).

In this case, however, James demonstrates no basis upon which the prison officials could have known that requiring him to sit in "props" would significantly aggravate a serious medical condition, particularly in light of the fact that when he received a disciplinary case, the medical department specifically said that he could do so, as long as he received a break every 45 minutes or so. It should also be noted that Fields, the nurse manager, made this statement in connection with a disciplinary case which James received on June 22, 2004. Even assuming that this statement gave notice to James' counselors that he required a break every 45 minutes or so, James makes no complaints about incidents occurring between the time that Fields' statement was made and the time that he, James, was transferred off of the Beto Unit, and any action taken by the counselors prior to June 22, 2004, was necessarily done without knowledge of Fields' statement. James has failed to show that he was the victim of cruel and unusual punishment and so his claim on this point is without merit.

James also points out that as a result the disciplinary cases he received, he could not continue in the program, and so he was unable to make parole as soon as he could have otherwise. The Fifth Circuit has held that Texas inmates have no constitutional right to or liberty interest in release on parole. <u>Creel v. Keene</u>, 928 F.2d 707, 708-09 (5th Cir. 1991); *see also* <u>Allison v. Kyle</u>, 66 F.3d 71, 74 (5th Cir. 1995). The Fifth Circuit has also held that there are no procedural due process protections for procedures unrelated to protected liberty interests, specifically including parole procedures. <u>Johnson v. Rodriguez</u>, 110 F.3d 299, 308-09 and n. 13. In <u>Johnson</u>, the Fifth Circuit expressly stated that because Texas prisoners have no protected liberty interest in parole, they cannot mount a challenge against any state parole review procedure on procedural or substantive grounds. <u>Johnson</u>, 110 F.3d at 308.

14

Under this precedent, because James has no constitutionally protected liberty interest in parole, he is precluded from raising a procedural or substantive due process challenge to the procedures attendant to the parole decision, including the requirement that he complete the PRTC program as a condition of gaining parole.   There is no constitutional right to participate in rehabilitation programs.   Green v. McKaskle, 788 F.2d 1116, 1125 (5th Cir. 1986); Newman v. Alabama, 559 F.2d 283, 291 (5th Cir. 1977). Consequently, the fact that James was required to participate in the PRTC program as a condition of gaining parole, and the fact that he was not given parole as soon as he wished as a result of his failure to complete this program, are not in themselves constitutional violations.

Next, James testified at the Spears hearing that as part of the program, he was placed under the control of other inmates.  He maintained that this was a constitutional violation because it contravened the consent decree in Ruiz v. Estelle, the long-running Texas prison oversight case.

The legal basis of James' claim is incorrect because the Fifth Circuit has expressly held that violations of consent decrees do not by themselves give rise to constitutional violations. Galloway v. State of Louisiana, 817 F.2d 1154, 1157 (5th Cir. 1987); Green v. McKaskle, 788 F.2d at 1123 (remedial decrees "do not create or enlarge constitutional rights.") Thus, the fact that practices within the PRTC program may have violated the Ruiz consent decree does not automatically show a violation of the Constitution redressable under Section 1983.  The Fifth Circuit has expressly stated that remedial decrees cannot serve as a substantive basis for a claim of damages under Section 1983.  Purvis v. Johnson, 78 Fed.Appx. 377 (5th Cir., October 21, 2003) (not selected for publication in the Federal Reporter), citing Green, 788 F.2d at 1123.  James' claim on this point is without merit.

James complains that Elizabeth Ortiz and Douglas Dretke were officials in charge of the program, but refused to take corrective action.  As a general rule, lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of respondeat superior, which does not generally apply in Section 1983 cases.  Williams v. Luna, 909

F.2d 121 (5th Cir. 1990).  A supervisor may be held liable if there is personal involvement in a constitutional deprivation, a causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation.  Thompkins v. Belt, 828 F.2d 298 (5th Cir. 1987).

In this case, James has not shown that either Dretke or Ortiz were personally involved ion a constitutional deprivation, that wrongful conduct by these persons was causally connected to a constitutional deprivation, or that they implemented constitutionally deficient policies which were the moving force behind a constitutional deprivation.  Although James complains of the "policy" allowing inmates to act in a supervisory role, he fails to show that either of these supervisors were aware of such a policy, nor that a constitutional violation resulted.  Perhaps more significantly, the Fifth Circuit has held that absent primary liability, there can be no supervisory liability.  Gibbs v. King, 779 F.2d 1040, 1046 n.6 (5th Cir.), cert. denied 476 U.S. 1117 (1986).  In this case, James has failed to show primary liability, and so his claim on this point is without merit.

James additionally complains that the Defendants were involved in a conspiracy against him.  The Fifth Circuit has held that to recover on a claim of a conspiracy, there must be an actual deprivation of a constitutional right; a mere conspiracy to deprive is insufficient.  Villanueva v. McInnis, 723 F.2d 414, 418 (5th Cir. 1984).  In this case, he has not shown the actual deprivation of a constitutional right, and so his conspiracy claim is without merit.

As noted at the outset, James' claims include allegations occurring at the Beto Unit, in the Eastern District of Texas, and the Hamilton Unit, in the Southern District of Texas.  Those claims arising at the Hamilton Unit should be transferred to the Southern District of Texas for such other and further proceedings as that Court may deem appropriate.

Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees.  Section

16

1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989).  A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.  Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, James' complaint regarding incidents at the Beto Unit lacks any arguable basis in law and fails to state a claim upon which relief may be granted.  Consequently, his lawsuit on these claims may be dismissed as frivolous under 28 U.S.C. §1915A(b).  *See generally* Thompson v. Paterson, 985 F.2d 202 (5th Cir. 1993).  It is accordingly

ORDERED that the above-styled civil action, which incorporates those claims arising at the Beto Unit, be and hereby is DISMISSED with prejudice as frivolous.  28 U.S.C. §1915A(b).  Such dismissal includes only James' claims regarding the Beto Unit, and does not affect any claims which he may have regarding the Hamilton Unit.  It is further

ORDERED that the Defendants V. Carlson, E. Cairns, Madeline Ortiz, and Douglas Dretke are hereby DISMISSED as parties to this lawsuit.  It is further

ORDERED that the Plaintiff's claims involving the Hamilton Unit are hereby SEVERED from this lawsuit and TRANSFERRED to the U.S. District Court for the Southern District of Texas, Houston Division, for such other and further proceedings as that Court may deem appropriate.  28 U.S.C. §1406(a).  Finally, it is

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

**So ORDERED and SIGNED this 25th day of April, 2007.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE